UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

GGIS INSURANCE SERVICES, INC.,   :
d/b/a GUARDIAN GENERAL          :      NO.: 1:10-CV-00932
INSURANCE SERVICES, and         :
RICHARD ACUNTO,                 :      (JUDGE CONNER)
      Petitioners        :      (MAGISTRATE JUDGE PRINCE)
                                :
v.                              :
LINCOLN GENERAL INSURANCE       :
COMPANY,                        :
      Respondent         :
                                :
-------------------------------------------------:
                                :
LINCOLN GENERAL INSURANCE       :
COMPANY,                        :
      Petitioner         :
                                :
v.                              :
                                :
GGIS INSURANCE SERVICES, INC.   :
and RICHARD ACUNTO,             :
      Respondents        :
                                :

## <u>REPORT AND RECOMMENDATION</u>

      Pursuant to an Order entered on November 9, 2010 (Doc. 30), Honorable Judge

Christopher C. Conner referred the pending motions for summary judgment (Docs. 16,

19) to the undersigned Magistrate Judge for the purpose of preparing a Report and

Recommendation.


**I. Background**

      This case revolves around a written agreement between GGIS Insurance

Services, Inc. (GGIS) and Lincoln General Insurance Company (Lincoln) and a personal

guaranty of the agreement by Richard Acunto, CEO of GGIS. The central questions are whether the guaranty, which incorporated the GGIS–Lincoln agreement, reached the provision in the agreement requiring mandatory arbitration for all related disputes, and if so, whether Lincoln waived its right to demand arbitration by initiating litigation related to the agreement.

*(A) Facts of the case*

The material facts of this case are undisputed, and as related here, are drawn from the parties' submissions to the Court.

(1) The parties and their contracts

GGIS is a California corporation with its principal place of business in California. (Doc. 20, ¶ 1; Doc. 23, ¶ 1.) Richard Acunto is an adult individual and a resident of California. (Doc. 20, ¶ 2; Doc. 23, ¶ 2.) At all relevant times, Acunto was the principal owner, president, and CEO of GGIS. (Doc. 20, ¶ 3; Doc. 23, ¶ 3.) Lincoln is a Pennsylvania corporation with its principal place of business in Pennsylvania. (Doc. 20, ¶ 4; Doc. 23, ¶ 4.)

In April 2005, GGIS and Lincoln entered into a written agreement, effective April 19, 2005, entitled the Program Manager Agreement (PMA), under which GGIS agreed to become a general agent for Lincoln. (Doc. 18, ¶ 1; Doc. 25, ¶ 1.) Under the agreement, GGIS acted as Lincoln's fiduciary in managing insurance brokers selling Lincoln's insurance policies. (Doc. 18, ¶ 1; Doc. 25, ¶ 1.) Acunto, as CEO of GGIS, executed the PMA on GGIS's behalf on April 27, 2005; Scott Butler, a VP of Lincoln, executed it on April 29. (Doc. 18, ¶¶ 2–3; Doc. 25, ¶¶ 2–3.)

Acunto separately executed a "Manager's Personal Guaranty" in his personal capacity on April 27, 2005. (Doc. 18, ¶ 4; Doc. 25, ¶ 4.) It is disputed whether the Guaranty was "annexed" to the PMA (Doc. 18, ¶ 4) or "incorporated into and made a part of" the PMA (Doc. 25, ¶ 4.)

### (2) Pertinent excerpts from the PMA and the Guaranty

Article XIX of the PMA contains the agreement's provision for arbitration:

A. <u>Submission to Arbitration.</u> In the event of any dispute between the Company [Lincoln] and the Manager [GGIS] with reference to the interpretation, application, formation, enforcement or validity of this Agreement, or their rights with respect to any transaction involved, whether such dispute arises before or after termination of this Agreement, such dispute, upon written request of either party, shall be submitted to the decision of a board of arbitration . . . . Notwithstanding the generality of the foregoing, the Company's right . . . to obtain any other legally available injunctive remedies shall not be limited by the submission of any dispute to arbitration. The board of arbitration will have complete jurisdiction over the entire matter in dispute, including any question as to its arbitrability.

. . . .

J. <u>Procedural Law.</u> The Pennsylvania Arbitration Act shall govern the conduct of arbitrations pursuant to this Agreement.

(Doc. 18-3, at 20–21.) The following Article XX provides that "[t]he rights of the parties to this Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania without regard to Pennsylvania rules on conflict of laws." (*Id.* at 21.)

The Guaranty, which has a header identifying it as Endorsement G to the PMA, states:

NOW THEREFORE, to induce LGIC [Lincoln] to enter into the Agreement, a copy of which is attached hereto and incorporated herein as if fully set forth, the undersigned [Acunto in his individual capacity] . . . with intent to be

3

legally and personally bound does hereby agree:

1. The recitals heretofore set forth are incorporated herein as if fully set forth.

(Doc. 18-3, at 42.)

On April 24, 2007, Lincoln sent GGIS a letter terminating the PMA, but GGIS remained Lincoln's agent for the purpose of servicing existing business until its expiration. (Doc. 21, ¶ 11; Doc. 23, ¶ 11.)

### (3) Subsequent court actions

On April 27, 2007, Lincoln filed a civil action in California state court in the West District of Los Angeles County, following Lincoln's "concerns over GGIS's treatment of escrowed funds held by GGIS in trust." (Doc. 18, ¶ 8; Doc. 25, ¶ 8; Doc. 20, ¶ 12; Doc. 23, ¶ 12.) The claims in that action arose out of the PMA, upon which Lincoln later based its arbitration claims. (Doc. 18, ¶ 8; Doc. 25, ¶ 8.) On May 1, 2007, Lincoln filed an ex parte application for an order to show cause why a preliminary injunction and temporary restraining order should not be issued against GGIS; the court denied the application the same day. (Doc. 18-3, at 46–47.) Lincoln voluntarily dismissed the action on July 27, 2007, based on the parties' intention to negotiate a resolution. (Doc. 18, ¶ 8; Doc. 25, ¶ 8.)

On July 30, 2008, Lincoln demanded arbitration against both GGIS and Acunto in his individual capacity, seeking resolution of matters related to an escrow account and monetary claims arising from contingent commissions allegedly due to Lincoln under the terms of the PMA. (Doc. 18, ¶ 14; Doc. 25, ¶ 14; Doc. 18-3, at 77.) An arbitration panel was assembled. On June 26, 2009, an organizational meeting took place at Lincoln's offices. An attorney for GGIS, Michael Stoller, participated via teleconference, making a "special appearance" to protest to the panel that arbitration was the improper forum for the dispute in light of the litigation filed in California. (Doc. 18, ¶ 15; Doc. 25, ¶ 15.) On

September 11, 2009, the arbitration panel informed all parties that "the Panel currently considers that [the claim asserted by Lincoln in this arbitration against Mr. Acunto in his individual capacity] falls within the purview of the current arbitration and that the presently constituted Panel is the appropriate body to resolve all disputes pertaining to this claim." (Doc. 18, ¶ 16; Doc. 25, ¶ 16; Arbitral Panel's Order of Feb. 27, 2010, Doc. 18-3, at 89, 92.) The panel also confirmed a hearing date scheduled for March 1, 2010. (Doc. 18, ¶ 16; Doc. 25, ¶ 16; Doc. 18-3, at 92.)

By letters dated February 24, 25, and 26, 2010, GGIS and Acunto requested an extension of time for the commencement of arbitration proceedings. (Doc. 18, ¶ 17; Doc. 25, ¶ 17.) They explained that the arbitration should not proceed against Acunto because he had never consented to the arbitration and that any arbitration or award would violate his due-process rights. (Doc. 18, ¶ 17; Doc. 25, ¶ 17.) They further stated to the panel that Lincoln had already pursued its claims in California state court, arguing that Lincoln had thereby waived its right to enforce arbitration against GGIS. (Doc. 18, ¶ 17; Doc. 25, ¶ 17.)

On February 27, 2010, the panel issued an order denying GGIS and Acunto's request for an extension. (Doc. 18, ¶ 18; Doc. 25, ¶ 18.) The panel held that Article XIX of the PMA provided the panel with "complete jurisdiction over the entire matter in dispute, including any question as to arbitrability," concluding that the parties "wanted the arbitration panel, NOT the Courts, to determine issues pertaining to jurisdiction and arbitrability." (Doc. 18, ¶ 18; Doc. 25, ¶ 18; Doc. 18-3, at 95 (quoting PMA Art. XIX).) That same day, counsel for GGIS and Acunto sent an email to the panel stating: "We believe that you do not have authority over Mr. Acunto and [GGIS]. We will again present this law to you at the hearing." (Doc. 18, ¶ 19; Doc. 25, ¶ 19.)

The hearing took place on March 1, 2010. Counsel for GGIS and Acunto argued to the panel that the panel did not have jurisdiction over Acunto and requested a reconsideration of the February 27 order. (Doc. 18, ¶ 20; Doc. 25, ¶ 20.) The panel denied the

request. (Doc. 18, ¶ 20; Doc. 25, ¶ 20; Final Arbitration Award, March 30, 2010, Doc. 18-3, at 121, 124.) GGIS and Acunto did not participate in the March 1 hearing, except to the extent that counsel provided a jurisdictional argument on Acunto's behalf, and they provided no evidence or testimony regarding the merits of Lincoln's arbitration claim. (Doc. 18, ¶ 21; Doc. 25, ¶ 21.)

The arbitration panel's final award of March 30, 2010, reaffirmed its finding that it had jurisdiction over both GGIS and Acunto. (Doc. 18-3, at 122.) The panel found Guardian in default on its obligation to pay contingent commissions due to Lincoln totaling $1,029,432 and its obligation to fund an escrow account for future contingent commissions in the amount of $923,083. (*Id.*) The panel's order required Guardian and Acunto to pay Lincoln the former sum and deposit the latter sum in an escrow account within 30 days, as well as to reimburse Lincoln $36,402.43 for arbitration costs that it incurred. (*Id.*)

Meanwhile, back on June 24, 2009, GGIS had initiated proceedings against Lincoln in California state court, making a variety of claims arising out of the business dealings between the two entities. (Doc. 18, ¶ 9; Doc. 25, ¶ 9.) GGIS did not serve Lincoln with the suit until January 25, 2010. (Doc. 20, ¶ 17; Doc. 23, ¶ 17.) On February 3, 2010, Lincoln removed the action to the District Court for the Central District of California. (Doc. 18, ¶ 10; Doc. 25, ¶ 10.) On February 11, Lincoln answered the complaint, raising improper venue as an affirmative defense, but did not move to compel arbitration. (Doc. 18, ¶ 11; Doc. 25, ¶ 11.) On March 16, Lincoln filed a motion to dismiss or to transfer venue, which the court granted on May 25; the case was transferred to the Middle District of Pennsylvania, and is one of the three cases consolidated into the matter presently before the Court. (Doc. 20, ¶¶ 20, 21; Doc. 23, ¶¶ 20, 21; Doc. 18, ¶ 13; Doc. 25, ¶ 13.)

*(B) Procedural history*

The lead case in the consolidated action before the Court originated on April 29, 2010, when GGIS and Acunto filed a petition to vacate or modify the arbitration award. (Doc. 1.) Unlike the other two consolidated cases, this petition was originally filed in federal court in the Middle District of Pennsylvania. (*Id.*) Lincoln answered the petition on May 21, 2010. (Doc. 8.) Shortly thereafter, on June 7, the Court issued an order (Doc. 10), which, along with a later order of December 1 (Doc. 27), found that GGIS's petition was one of several cases involving common parties and common questions of fact, and consolidated this case with two others:

- *Lincoln Gen. Ins. Co. v. Guardian Gen. Ins. Servs., Inc.*, No. 10-0932 (the Lincoln state-court action), originally filed April 30, 2010 in the Pennsylvania Court of Common Pleas in York County, later removed by GGIS to federal court; in this case, Lincoln petitioned to confirm the arbitration award; and

- *Guardian Ins. Servs., Inc. v. Lincoln Gen. Ins. Co.*, No. 10-1000 (the GGIS state-court action), originally filed June 24, 2009, in California state court, as discussed *supra*.

Following the June 7 consolidation, GGIS and Acunto filed an answer to the petition in the Lincoln state-court action on June 10, 2010. (Doc. 12.)

Three months passed, and on September 15, 2010, GGIS and Acunto filed a motion for summary judgment (Doc. 16), along with a brief in support (Doc. 17) and a statement of facts (Doc. 18). That same day, Lincoln filed its own. (Docs. 19–21.) Both sets of parties—GGIS and Acunto on the one hand, and Lincoln on the other—filed briefs in opposition and answers to each others' statements of facts on October 4. (Docs. 22–25.) Lincoln filed a reply brief on October 21. (Doc. 26.) All filing deadlines having passed for the two motions for summary judgment, the motions are ripe for adjudication.

## II. Standard of Review

Federal Rule of Civil Procedure 56(c) requires the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Anderson*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1287–88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. When the party seeking summary judgment satisfies its burden under Rule 56(c) of identifying evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56(e) to go beyond the pleadings with affidavits, depositions, answers to interrogatories, or the like in order to demonstrate specific material facts that give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The party opposing the motion "must

do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). When Rule 56(e) shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case that it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323; *see Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

## III. Discussion

As mentioned above, there are two major questions that these consolidated cases present on summary judgment: first, whether the language of incorporation in the Guaranty reached the provision in the PMA requiring arbitration for all related disputes, and second, if the Guaranty did incorporate the PMA's arbitration provision, whether Lincoln waived its right to demand arbitration by initiating litigation related to the agreement. Because a court's substantive review of arbitral decisions is highly deferential, the success of GGIS and Acunto's petition to vacate the arbitration award turns on these jurisdictional issues. *See* 42 Pa. Cons. Stat. Ann. § 7341 (2007) (precluding substantive review of common-law arbitration awards except in cases of, e.g., "fraud, misconduct, corruption or other irregularity").

### (A) Extent of incorporation by reference

#### (1) Applicable law

Federal law applies to the interpretation of arbitration agreements. *Gen. Elec. Co. v. Deutz*, 270 F.3d 144, 154 (3d Cir. 2001) (citing *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519–20 (1974); *Becker Autoradio U.S.A., Inc. v. Becker Autoradiowerk GmbH*, 585 F.2d 39, 43 (3d Cir. 1978)); Under federal law, "ordinary state-law principles that govern

the formation of contracts" determines whether the parties have agreed to arbitrate. *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 524 (3d Cir. 2009) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

The PMA, the contractual validity of which is not disputed, states in Article XX that Pennsylvania law applies to disputes related to the PMA. (Doc. 18-3, at 21.) There is also no dispute either that the Guaranty is valid or that it incorporates Article XX. Accordingly, Pennsylvania law applies inasmuch as state law controls in this case; and under Pennsylvania law, "arbitration provisions, like other contractual provisions, may be incorporated by reference through general incorporation provisions." *Century*, 584 F.3d at 534.


(2) Whether the Guaranty incorporated the arbitration provision of the PMA

Acunto argues that he never agreed to have claims against him submitted to arbitration. He notes that the Guaranty contains no arbitration clause itself, and that the language incorporating the PMA by reference makes no specific reference to incorporating the arbitration clause.

In his briefs filed in connection with the pending motions, Acunto cites two cases on the topic of incorporation by reference. (Doc. 17, at 10; Doc. 22, at 10.) The first establishes that, under Delaware law, a guaranty and the underlying contract are separate contracts. *In re Stone & Webster, Inc.*, 558 F.3d 234, 242 (3d Cir. 2009) (quoting and reversing *In re Stone & Webster, Inc.*, No. 00-2142, 2005 WL 1036556, at *6 n.12 (May 3, 2005)). Even were the same proposition true for Pennsylvania law, the separate nature of a guaranty and an underlying contract does not preclude the possibility that a guaranty may effectively and validly incorporate all the provisions of the underlying contract. But Pennsylvania law in fact differs on this matter:

> Where the guaranty or promise, though collateral to the principal contract, is made at the same time with the principal contract, and becomes an essential ground of the credit given to the principal debtor, the whole is one original and entire transaction, and the consideration extends and sustains the promise of the principal debtor, and also of the guarantor.

*Internazionale Graniti S.R.L. v. Monticello Granite Ltd.*, No. 07-1790, 2009 WL 2461803, at *2 (E.D. Pa. Aug. 12, 2009) (quoting *Snevily v. Johnston*, 1841 WL 4090, at *3, 1 Watts & Serg. 307 (Pa. 1841)). Since the Guaranty was executed on the same day as the PMA, was attached to the PMA as an endorsement, and explicitly states that its purpose was to induce Lincoln to enter into the PMA, there are strong grounds for a holding that the Guaranty was actually part of the PMA, which would by itself end the otherwise-complex matter of incorporation by reference.

The second case that Acunto cites is *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144 (3d Cir. 2001). In that case, the defendant, Deutz, argued that the district court had no jurisdiction over the dispute because both Deutz as guarantor and General Electric itself were bound by the arbitration provision in the contract in question. *Id.* at 152. At trial, the district court had determined that the ambiguity in the arbitration clause over who determines arbitrability—the arbitral panel or the court—required the court to answer the question itself. *Id.* In support of its decision that the court itself, not an arbitral board, had jurisdiction over the merits of the dispute, *id.*, the district court cited several salient facts.

The district court emphasized that the contract's title named only Moteren-Werke Mannheim AG and General Electric, indicating that they, and not Deutz, were parties to the contract. *Id.* at 153. Those companies initialed every page of the agreement, but Deutz did not. *Id.* In Section 7 of the contract, which concerned arbitration, General Electric and Moteren-Werke were specifically mentioned in numerous instances, but Deutz is not mentioned at all in that section. *Id.* Finally, Deutz signed the contract in a separate signature block, "specifying that it was a party 'for purposes of the obligations set forth in

Section 9.08 hereof and Sections 4.05, 4.06, and 4.07 hereof," where those sections contained the guaranty and provisions regarding confidentiality. *Id.*

On the basis of these facts, the district court determined that, because of the ambiguity in the arbitration clause, the question of arbitrability should be submitted to a jury, as permitted by the Federal Arbitration Act. *Id.* The jury returned a special verdict finding that General Electric and Deutz had not agreed to arbitration. *Id.* On appeal, the Third Circuit affirmed the trial court's decision. *Id.* In its review of relevant federal jurisprudence, the appellate court remarked that although federal policy favors arbitration, and that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," this presumption does not apply to the question of arbitrability *vel non. Id.* at 154 (quoting *Moses H. Cone Mem'l Hosp v. Mercury Constr. Corp.*, 460 U.S. 1., 24–25 (1983)). Rather, "silence or ambiguity about the question *who* (primarily) should decide arbitrability" gives rise to a presumption that a court, not an arbitral panel, should decide the question, and a court "should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *Id.* at 154–55 (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

Acunto argues that, based on the parallels he finds between the present case and *Deutz*, that whether the Guaranty effectively incorporated Article XIX of the PMA is ambiguous—and given that ambiguity in matters of arbitrability means that a court decides the matter, the arbitral panel should not have decided arbitrability. Yet in making this argument, Acunto overlooks critical factual distinctions. Unlike in *Deutz*, it is not true that the signatories to the underlying contract, in this case Lincoln and GGIS, initialed each page of the contract whereas Acunto did not. Rather, no one initialed the contract page by page. Even more significantly, the part of the contract in *Deutz* that Deutz signed specifically stated that Deutz was a signatory only for the purposes of certain specified provisions, among which was not the provision that provided for arbitration. Instead, the

Guaranty that Acunto signed explicitly incorporated the whole of the PMA "as if fully set forth." (Doc. 18-3, at 42.) The broad, unconditional language of the Guaranty bears no resemblance to the specifically limited language of the contract that Deutz signed. *Deutz* does not support Acunto's argument that there is ambiguity in the matter of whether the Guaranty incorporate the arbitration provision of the PMA.

The primary case that Lincoln cites in support of its position is *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 524 (3d Cir. 2009), which Lincoln takes to mean that a general incorporation clause in a surety contract can effectively incorporate an arbitration agreement in an underlying contract, rendering arbitration binding on the party signing the surety, even when the party signing the surety is not among the parties specifically named in the arbitration provision of the underlying contract.

*Century* involved a set of three substantially similar reinsurance treaties (between Argonaut, an insurer, and Century, a reinsurer) and three corresponding retrocessional agreements (between Century and their retrocessionaire, Lloyd's).[1] *Id.* at 519, 550. The reinsurance treaties between Argonaut and Century each contained an arbitration clause as follows: "If any dispute shall arise between the Company [Argonaut] and INA [Century] with reference to the interpretation of this Agreement or their rights with respect to any transaction involved, the dispute shall be referred to three arbitrators . . . ." *Id.* at 550 (alterations in original). The corresponding retrocessional agreements between Century and Lloyd's had language of incorporation. *Id.*

A dispute over coverage between Argonaut and some of its insureds that began in the late 1970s led Argonaut to seek reimbursement from Century for litigation expenses. *Id.* at 519. Century paid out, then sought from Lloyd's its share of the costs. *Id.* at 520.

---

[1]Reinsurance contracts covering classes of risk rather than particular policies are called reinsurance treaties. Retrocessional agreements are contracts for reinsurance of reinsurance. A reinsurer of reinsurance is called a retrocessionaire.

Lloyd's refused to pay, so Century sued Lloyd's in a case filed first in state court and then removed to federal court. *Id.* Lloyd's moved to compel arbitration, arguing that the retrocessional agreements' incorporation language rendered the arbitration provisions in the reinsurance treaties enforceable by Lloyd's against Century. *Id.*

Exercising plenary review, the Third Circuit conducted a painstaking analysis of relevant precedent in this and other circuits, ultimately concluding that the incorporation clause of the retrocessional agreements did reach the arbitration clauses of the reinsurance treaties. *Id.* at 555. In reaching this conclusion, the court distinguished cases in which incorporation provisions were found not to reach arbitration clauses in the underlying contracts, but discussed with apparent approval several cases "in harmony with the principle that a general incorporation clause effectively can incorporate an arbitration agreement." *Id.* at 538. *Compare id.* at 541–2 (citing *World Rentals & Sales, LLC v. Volvo Constr. Equip Rents, Inc.*, 517 F.3d 1240 (11th Cir. 2008)) (declining to adopt a hard-and-fast rule against incorporating restrictively phrased arbitration provisions), *and id.* at 542–44 (citing *Rice Co. v. Precious Flowers Ltd.*, 523 F.3d 528 (5th Cir. 2008)) (distinguishing *Precious Flowers* on the grounds that it was based on principles of agency, not contract law), *and id.* at 544–45 (citing *United Steelworkers v. Rohm & Haas*, 522 F.3d 324 (3d Cir. 2008)) (explaining that the petitioners in *Rohm & Haas* could not compel arbitration because the dispute in question was outside the scope of the incorporated arbitration clause), *and id.* at 546–47 (citing *U.S. Small Bus. Admin. v. Chimicles*, 447 F.3d 207 (3d Cir. 2006)) (describing the multiple bases for concluding that the arbitration provision in *Chimicles* did not apply in that case, and emphasizing that the decision "relied on the incorporation clause itself"), *with id.* at 536 (citing *U.S. Fid. & Guar. Co. v. W. Point Constr. Co.*, 837 F.2d 1507 (11th Cir. 1988) (per curiam)) (reviewing *West Point Construction*, in which a performance bond incorporated a subcontract with an arbitration clause, the subcontract incorporated a general contract

with an arbitration clause, and the Eleventh Circuit held that the general contractor could enforce the general contract's arbitration clause against the surety that signed the performance bond), and *id.* (citing *Exch. Mut. Ins. Co. v. Haskell Co.*, 742 F.2d 274 (6th Cir. 1984) (per curiam)) (discussing *Haskell*, which had facts and a resolution analogous to *West Point Construction*), and *id.* at 537 (citing *Commercial Union Ins. Co. v. Gilbane Bldg. Co.*, 992 F.2d 386 (1st Cir. 1993)) (providing a gloss on *Gilbane Building*, which, like the previous two cases, involved a prime contract, a subcontract, and a performance bond, with the court ultimately holding that the contractor was bound to arbitrate its claim against the surety under the performance bond).

In discussing the specific facts of the case, the *Century* court found it especially convincing that the retrocessional agreements each had "dual" integration clauses. *Id.* at 550. Paragraph 1 of the agreements allocated risks and payments, then incorporated the pertinent reinsurance treaty, stating that a copy of the treaty is attached and "made a part hereof." *Id.* Paragraph 2 provided: "Subject to the . . . allocation in the preceding paragraph, all terms and provisions of the [reinsurance treaty] shall be applied to this agreement as if contained herein . . . ." *Id.* (alteration in original). The Third Circuit observed that this "reiterative incorporation clause" was phrased "more strongly and expansively" than in many of the cases in which incorporation clauses were held to reach the arbitration clause. *Id.* at 551–52 (citing *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela*, 991 F.2d 42, 45–46 (2d Cir. 1993)). Perhaps most significantly to the court, the very fact that language of incorporation was used in two successive paragraphs meant that the second instance, in paragraph 2, was intended to do more than merely define the scope of derivative liability. *Id.* at 551 (citing *AgGrow Oils, L.L.C. v. Nat'l Union Fire Ins. Co.*, 242 F.3d 777, 781–82 (8th Cir. 2001) (noting that incorporation by reference had the effect of defining the scope of the surety's secondary liability)). Being bound to interpret all provisions of a contract as meaningful

15

rather than duplicative, the court held that paragraph 2 did "precisely what [it] says"—it applied to Lloyd's and Century the terms of the underlying contract, including the arbitration provision. *Id.* at 552 (citing *Capek v. Devito*, 767 A.2d 1047, 1050 (Pa. 2001) (requiring all contractual provisions to be given effect)).

The absence of certain sorts of language from the incorporation clauses lent further support to the Third Circuit's conclusion. For instance, there was no provision in any of the contracts at issue in *Century* that limited the applicability of the incorporated arbitration clause. *Id.* at 552 (citing *U.S. Small Bus. Admin. v. Chimicles*, 447 F.3d 207, 209–10 (3d Cir. 2006) (holding a partnership not compelled to submit to arbitration when the relevant incorporation language explicitly did not incorporate as against the partnership)). Neither was there a "specifically applicable contractual exclusion." *Id.* at 552 (citing *Chimicles*, 447 F.3d at 211 (noting that the partnership agreement at issue specifically excluded from arbitration the "exact circumstance under which dispute" arose)).

Arguing against the relevance of *Century*, Acunto insists that he never agreed to arbitrate claims against him and reminds the Court that the Guaranty itself neither contains an arbitration clause nor specifically incorporates one by reference. (Doc. 22, at 10.) Whether Acunto agreed to arbitration is, of course, exactly what is in issue in this case. As for the Guaranty's lack of specific reference to arbitration, such lack is not outcome determinative. Neither *Century* nor other pertinent case law requires explicit reference to an arbitration clause in order for language of incorporation to incorporate an arbitration provision. To the contrary, since arbitration agreements are subject to the same standard of review as any other contract, no "express" or "unequivocal" reference to an arbitration clause is required. *Century*, 584 F.3d at 555. Acunto's position is further undermined by the fact that the Guaranty, like the retrocessional agreements in *Century*, contains two passages with language of incorporation. The Guaranty's preliminary recitals state: "NOW THEREFORE, to induce [Lincoln] to enter into the Agreement, a

copy of which is attached hereto and incorporated herein as if fully set forth, the undersigned [Acunto]" agrees to the provisions that follow. (Doc. 18-3, at 42.) Then, the first numbered paragraph states: "The recitals heretofore set forth are incorporated herein as if fully set forth." (*Id.*) It is no more appropriate in this case than it was for the *Century* court to interpret the second instance of incorporation language as perfunctorily duplicative. *Century*, 584 F.3d at 552 (citing *Capek v. Devito*, 767 A.2d 1047, 1050 (Pa. 2001)); *Capek*, 767 A.2d at 1050 (quoting *Cerceo v. DeMarco*, 137 A.2d 296, 298 (Pa. 1958)) ("An interpretation will not be given to one part of the contract [that] will annul another part of it."). If the first instance of language of incorporation could be said to do no more than define the scope of Acunto's derivative liability—an argument that Acunto did not actually make—then the second instance must be construed to do precisely what it says: "fully set forth" the foregoing recitals, including the incorporation of the PMA. (Doc. 18-3, at 42.) Nothing indicates that Article XIX of the PMA, providing for mandatory arbitration, is excluded from the scope of the incorporation language in the Guaranty. In light of the unbounded language of incorporation, the reference in Article XIX to disputes between "the Company [Lincoln] and Manager [GGIS]" (*id.* at 20) does not mean that Acunto cannot be personally bound by Article XIX. The answer again comes from *Century*, in which the arbitration provision at issue made specific reference to parties that did not include Lloyd's, a nonsignatory, but Lloyd's could invoke arbitration because the retrocessional agreement incorporated the arbitration provision. *Century*, 584 F.3d at 520, 554–555; *see id.* at 555 (declining to "strictly preserve[]" the "original, literal meaning" of the restrictively worded arbitration clauses that the retrocessional agreements incorporated). Likewise, even though Article XIX mentions only Lincoln and GGIS, the Guaranty performs "a certain level of transplantation or translation to resolve the imprecision inherent in general incorporation language," *id.* at 555 which makes Article XIX effective against Acunto.

### (3) The "what" and "who" of arbitrability

The term "arbitrability" is, by, itself, ambiguous. A question of arbitrability may relate, on the one hand, to whether a particular merits-based issue is subject to arbitration; or on the other, it may relate to the matter of who—the court or the arbitrator—is empowered to decide what is arbitrable. *See First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 942 (1995) (distinguishing between questions of "*arbitrability* of the dispute" and questions of "*who should have the primary power to decide* [*that*] *matter*"). These questions constitute the "what" and "who" of arbitrability. In deciding *what* is arbitrable in the context of a valid arbitration agreement, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Id.* at 945 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985)). But when the question is *who* arbitrates, "the law reverses the presumption," and "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *Id.* at 944 (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)) (second and third alterations in original).

Given the discussion in Part III.A.2 and its conclusion, that the Guaranty did incorporate Article XIX of the PMA and render its arbitration provision binding against Acunto, there is no question that any matter relating to the merits of a dispute arising under the PMA is subject to arbitration. Over and above the presumption of a broad scope of arbitrability, paragraph A of Article XIX states: "The board of arbitration will have complete jurisdiction over the entire matter in dispute . . . ." (Doc. 18-3, at 20.) Acunto has presented no argument or evidence to suggest that the merits of his dispute with Lincoln are not within the scope of the PMA's arbitration clause, and the general presumption favoring arbitration, as well as the explicit language of Article XIX, conclude the matter: the dispute is subject to arbitration. Acunto's dispute is whether the

arbitral panel had the authority to determine its own jurisdiction. Acunto argues that he did not agree to arbitrate arbitrability, that is, the "who" of arbitrability; and Lincoln argues that he did.

A federal court always has jurisdiction to determine its own jurisdiction. *See United States v. United Mine Workers*, 330 U.S. 258, 291 (1947) (quoting *United States v. Shipp*, 203 U.S. 563, 573 (1906) (Holmes, J.)) (setting forth a federal court's duty "to take the time required for such consideration as it might need" to determine whether a case is properly before it). Consequently, even if the parties' contract did provide that an arbitral board should have the power to determine arbitrability, a federal court can address whether the contract did, in fact, contain such a provision. But if the answer is yes, "the court's standard for reviewing the arbitrator's decision about *that* matter should not differ from the standard courts apply when they review any other matter that parties have agreed to arbitrate." *First Options*, 514 U.S. at 943 (citing *AT & T Techs.*, 475 U.S. at 649; *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 583 n.7 (1960)). Under either the Federal Arbitration Act or the Pennsylvania Arbitration Act, judicial review of an arbitrator's decision, when the subject matter of the decision was properly before the arbitrator, is "extremely deferential." *Dluhos v. Strasberg*, 321 F.3d 365, 366 (3d Cir. 2003). *See* 9 U.S.C. 10(a) (2009) (providing for vacatur of an arbitral award under conditions including corruption, fraud, and "evident partiality" in the arbitrators); 42 Pa. Cons. Stat. Ann. § 7341 (1980) (allowing vacatur on grounds of "fraud, misconduct, corruption or other irregularity"). In a nutshell, the decision of an arbitral panel is final absent unusual circumstances, unless a matter that the panel decided was outside of its jurisdiction to decide.

The last sentence of PMA Article XIX at issue reads: "The board of arbitration will have complete jurisdiction over the entire matter in dispute, including any question as to its arbitrability." (Doc. 18-3, at 20.) The parties in this case devote little discussion to

the wording of this provision. Acunto generally states that the arbitral panel "improperly usurped this Court's role by making the initial and critical determination of arbitrability, i.e., whether the parties agreed to arbitrate" (Doc. 17, at 8); Lincoln summarily proclaims that it "is beyond dispute that Acunto agreed to arbitrate the issue of arbitrability," and that "[t]o suggest otherwise is illogical" (Doc. 24, at 12.) Although the parties' superficial treatment of the matter suggests otherwise, the language of Article XIX requires closer attention.

Both GGIS and Lincoln, the parties to the PMA, are sophisticated entities that can be assumed to have chosen the language of their contract carefully, with full awareness of the import of the words they used. *Century Indem. Co. v. Certain Underwriters at Lloyd's*, 584 F.3d 513, 551 (3d Cir. 2009) (citing *Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 429–30 (Pa. 2001)); *Murphy*, 777 A.2d at 429 (citing *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982)). No party to the present dispute argues that any part of Article XIX of the PMA is ambiguous; consequently, the meaning of Article XIX "must be determined by its contents alone." *Murphy*, 777 A.2d at 429 (quoting *Robert F. Felte, Inc. v. White*, 302 A.2d 347, 351 (Pa. 1973)).

The sentence of Article XIX in question can be broken down into two parts. There is first the general statement: "The board of arbitration will have complete jurisdiction over the entire matter in dispute . . . ." As discussed above, this statement is a clear reference to the scope of issues subject to arbitration. But the sentence continues, giving the board jurisdiction over the entire matter "including any question as to its arbitrability." If this second clause referred only to the scope of the arbitration clause, it would be unnecessary and superfluous. The first part of the sentence reserve to the arbitral board "complete jurisdiction over the entire matter in dispute," which already indicates in no uncertain terms a scope as broad as conceivably possible. This clear language rests on top of the strong presumption favoring a broad scope of arbitrability. Between the clear

language and the applicable presumption of arbitrability, the second part of the sentence adds nothing to the PMA if its intent is to clarify scope. Because Pennsylvania jurisprudence prevents a court from constructing a contract in a way that renders any part of it nugatory, the only possible meaning for the phrase "including any question as to its arbitrability" is to define not that *what* but the *who* of arbitrability.

So, then, the second part of the closing sentence of Article XIX, Paragraph A represents the parties' intention to arbitrate arbitrability. Far from being silent or ambiguous on the matter of who should decide arbitrability, Article XIX contains language that, unless it were rendered meaningless, must be read as reserving to the arbitral board the power to decide whether a particular dispute is arbitrable. *See First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944–45 (1995) (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985)) (discussing the presumptions applicable in questions regarding arbitrability).

Because the questions regarding both the "what" and "who" of arbitrability were properly before the arbitral panel, the Court cannot disturb their conclusions in the absence of exceptional circumstances like fraud, corruption or evident partiality. 9 U.S.C. § 10 (2009); 42 Pa. Cons. Stat. Ann. § 7341 (1980). Since no party has presented any evidence or argument of such exceptional circumstances, it is recommended that the panel's decision be held to have been properly rendered within its contractually appointed power.

### (B) Waiver

GGIS argues that the arbitration award against it should be set aside because Lincoln waived its right to arbitration when it litigated arbitrable matters. Additionally, GGIS urges, Lincoln should have filed a motion to compel arbitration, but it did not.

According to GGIS, waiver through litigation deprived the arbitrable panel of its jurisdiction over the dispute, meaning the panel exceeded its powers by issuing an award.

One of the problems with GGIS's argument lies in the different treatment accorded substantive and procedural arbitration questions. Although "substantive arbitrability"—the question of whether the parties agreed to arbitrate—is usually left to a court's determination, matters of "procedural arbitrability," which include "allegation[s] of waiver, delay, or a like defense to arbitrability," are presumptively left to the arbitrator. *Ross Dev. Co. v. Advanced Bldg. Dev., Inc.*, 803 A.2d 194, 196–97 (Pa. Super. 2002) (citing *AT & T Techs.*, 475 U.S. at 649; *Mack Mfg. Corp. v. Int'l Union, United Auto., Aircraft & Agric. Implement Workers Local 677*, 81 A.2d 562 (Pa. 1951)); *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) (quoting *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983)). All waiver arguments should have been presented to the arbitrators; federal court is not the proper forum for GGIS to claim waiver.

And, as the arbitral panel discussed (Doc. 18-3, at 130–31), both the Federal Arbitration Act and Pennsylvania's Uniform Arbitration Act have a permissive—not mandatory—provision for going to court to compel arbitration. The Federal Act states that a party "may" petition for an order, 9 U.S.C. § 4 (1954), and the Pennsylvania Act describes procedure for a motion to compel arbitration, but prescribes nothing compulsory, 42 Pa. Cons. Stat. Ann. § 7304(a) (2007). Lincoln never sought a court order compelling arbitration, but its choice to forego a court order does not constitute a waiver of its right to pursue binding arbitration.

GGIS also argues that Lincoln effected an implicit waiver of its right to arbitration. Even if this were not a procedural question that is within the arbitrators' jurisdiction to answer, GGIS's argument would founder here. Implicit waiver can be inferred from "acts or language so inconsistent with a purpose to stand on the contract provisions as to leave no opportunity for a reasonable inference to the contrary." *Goral v. Fox Ridge, Inc.*, 683

22

A.2d 931, 933 (Pa. Super. 1996) (quoting *Samuel J. Marranca Gen. Contracting Co. v. Amerimar Cherry Hill Assocs. Ltd. P'ship*, 610 A.2d 499, 501 (Pa. Super. 1992)). One important indicator of waiver is a party's acceptance of the judicial process, which may be evidenced by (1) failure to raise the issue of arbitration promptly, (2) engaging in discovery, (3) filing pretrial motions that do not raise the issue of arbitration, (4) waiting for adverse rulings on pretrial motions before seeking arbitration, and (5) waiting until the case is ready for trial before seeking arbitration. *Stanley-Laman Group, Ltd. v. Hyldahl*, 939 A.2d 378, 387 (Pa. Super. 2007) (quoting *St. Clair Area Sch. Dist. Bd. of Educ. v. E.I. Assocs.*, 733 A.2d 677, 682 n.6 (Pa. Cmwlth. 1999)). Because Pennsylvania law favors arbitration, waiver "should not be lightly inferred," and a court should not find waiver unless a party's conduct has gained that party "an undue advantage or resulted in prejudice to another." *Id.* (quoting *Kwalick v. Bosacco*, 478 A.2d 50, 52 (Pa. Super. 1984)). *Accord LSI Title Agency Inc. v. Evaluation Servs., Inc.*, 951 A.2d 384, 392 (Pa. Super. 2008).

Effective waiver of a right to arbitration thus requires two things: (1) acts or language inconsistent with the intention to seek arbitration and (2) undue advantage or prejudice to the opposing party. Each will be addressed in turn.

Before demanding arbitration against GGIS in late July 2008, Lincoln filed a civil action in California state court against GGIS on April 27, 2007. GGIS argues that this behavior was inconsistent with an intention to pursue arbitration. Significantly, though, this civil action was live only briefly and did not proceed far. On May 1, 2007, Lincoln applied for a temporary restraining order and a preliminary injunction; the application was denied the same day. (Doc. 18-3, at 46, 47.) There was no further development in the case until Lincoln sought voluntary dismissal on July 24, 2007, which was granted on August 1. (*Id.* at 47.) This state-court case comprised the only litigation related to arbitrable matters before Lincoln demanded arbitration on July 30, 2008.

GGIS has cited no cases, and the Court has found none, that suggest that a party waives the right to arbitration by seeking injunctive relief before initiating arbitration proceedings. A review of the relevant jurisprudence in fact suggests the opposite: that allowing a court to consider requests for injunctive relief "reinforces rather than detracts from the policy" favoring arbitration, because pro-arbitration policy "would frequently be frustrated if the courts were precluded from issuing preliminary injunctive relief to preserve the status quo pending arbitration and, *ipso facto*, the meaningfulness of the arbitration process." *Ortho Pharm. Corp. v. Amgen, Inc.*, 882 F.2d 806, 812 (3d Cir. 1989) (quoting *Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 51 (1st Cir. 1986)) (discussing a federal court's jurisdiction under the Federal Arbitration Act to issue preliminary injunctive relief in disputes that the parties agree are arbitrable).

An arbitration agreement should not force a party to endure possibly damaging conduct that only injunctive relief could halt. With this consideration in mind, seeking a temporary restraining order and preliminary injunction, as Lincoln did, is not inconsistent with the intention to later seek arbitration. That Lincoln was unsuccessful in its pursuit of a temporary restraining order and a preliminary injunction is not significant.

As for the matter of undue advantage or prejudice, there is no evidence of either. In fact, GGIS refers in its brief opposing Lincoln's motion for summary judgment to the matter of prejudice (Doc. 22, at 14), but goes on to discuss only the *St. Clair* factors regarding acceptance of the judicial process. There is no mention of anything unduly advantageous or prejudicial in Lincoln's conduct, and consequently no grounds for a finding of either.

It is therefore recommended that it be held that the question of waiver was properly presented to and considered by the arbitral panel, and that to the extent that the matter may be considered here, there are no grounds for finding waiver or for disturbing the panel's findings in this respect.

**IV. Conclusion**

Based on the foregoing discussion, it is recommended that Lincoln's motion for summary judgment be GRANTED; that GGIS and Acunto's motion for summary judgment be DENIED, and their petition to vacate the arbitration award be DENIED; and that Lincoln's motion to affirm the arbitration award be GRANTED.

s/ William T. Prince
William T. Prince
United States Magistrate Judge

January 26, 2011